**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| COLLEEN NICOLE PITTS and AMANDA CARLENE PITTS, | ) ) ) | |
| Plaintiffs | ) ) | Civil Action No. |
| v. | ) ) ) | |
| VICTOR HILL, Individually and in his capacity as Sheriff of Clayton County, Georgia | ) ) ) ) | JURY TRIAL DEMAND |
| Defendant. | ) ) ) | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**COMES NOW** Plaintiffs and respectfully states her claims as follows:

**Preliminary Statement**

1.     This action is brought seeking remedies under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (hereafter "Title VII").

**Jurisdiction and Venue**

2.     Jurisdiction of the claims in this Complaint is conferred by 42 U.S.C. § 1981. This case presents a federal question under 28 U.S.C. §§ 1331,

1343(a)(4). Plaintiff requests that this Court exercise pendant jurisdiction over her remaining state law claims.

3.     Venue is proper in the United States District Court for the Northern District of Georgia pursuant to 28 U.S.C. § 1391.

### Parties

4.     Plaintiffs, Colleen Nicole Pitts and Amanda Carlene Pitts, are residents of the State of Georgia.

5.     At all times material hereto, Defendant Victor Hill was and is a citizen of the State of Georgia and the Sheriff of Clayton County, Georgia. Defendant Hill may be served at his residence by delivering a copy of the Complaint to 335 Bear Creek Trail, Hampton, Clayton County, Georgia 30228, which is within the Northern District of Georgia, Atlanta Division.

### Facts Common to All Counts

6.     At all times relevant to the allegations, Plaintiff is and was a gay white female married to Amanda Carlene Pitts.

7.     On 6 October 2020 Plaintiff Nicole Pitts was employed by Defendant as a deputy sheriff.

8.     On that date, she was a law enforcement officer certified by the Georgia Peace Officers Training Council and was clothed with the powers of a Georgia deputy sheriff.

9.     Plaintiff was and is an active reservist in the United States Army.

10.    Plaintiff began her employment with the Clayton County Sheriff's Office ("CCSO") on or about 27 July 2020, after returning from a 12-month overseas deployment.

11.    Shortly after being hired by the Defendant and with no specialized training or instruction, Plaintiff was assigned to the specialized seven person "Elite Cobra Unit" which is charged with targeting "high crime, drug, and prostitution areas".

12.    The Cobra Unit is directed to interdict what the Defendant refers to as the "Three Ls" - littering, loitering, and loud music.

13.    While patrolling the area of Upper Riverdale Road and Tara Boulevard, a high crime area, on the afternoon of 6 October 2020, Plaintiff observed two individuals at the Checkers restaurant located at 6339 Tara Boulevard.

14.    Approximately one to two hours later, Plaintiff was called to assist other CCSO deputies with a female pat down at the Texaco gas station located adjacent to the Checkers.

15.    After conducting the pat down of the female, Plaintiff returned to her patrol of the area and noticed that the same individuals that had been at the Checkers hours earlier were still there.

16.    In keeping with her directives as a member of the Cobra Unit, she stopped her CCSO assigned patrol vehicle[1], to question the individuals about suspected loitering.

17.    Plaintiff parked the vehicle next to the outdoor concrete tables and benches at the Checkers.

18.    Plaintiff was wearing her CCSO issued protective vest, including a metal badge, and CCSO emblem when she exited the patrol car.

19.    The larger of the two males stood and started to leave when Plaintiff asked him to have a seat.

20.    Plaintiff recognized the smaller suspect as a regular of the area.

---

[1] Defendant's vehicle is easily identifiable by its CCSO markings and was equipped with lights and siren.

21.     Plaintiff then inquired of their identities and their purpose for remaining at the location for so long.

22.     One of the loitering suspects informed Plaintiff that he was waiting for his food, which was confirmed a short while later when it was brought out to him, while the larger of the two individuals immediately became upset and started yelling.

23.     The larger individual eventually identified himself as Demeriaus Alex Dareus (hereinafter "Dareus") but gave conflicting reports about where he was from.

24.     Dareus stated that he did not have a license or any identification, but then claimed to be licensed in California.

25.     Plaintiff radioed the reported name to dispatch to check for existing warrants.

26.     Due to Dareus' irate behavior, loitering, and inconsistent stories, Plaintiff moved to detain him in handcuffs while dispatch checked for any warrants.

27.     When she began to place handcuffs on Dareus, he attempted to turn around, pull his arms away, and stand up several times.

28.     Plaintiff was eventually able to get both handcuffs on Dareus with his hands behind his back.

29.     Dispatch indicated to Plaintiff that there was a possible arrest warrant for Dareus but did not provide any information regarding the nature of the warrant.

30.     Based on the information from dispatch, Plaintiff instructed Dareus to stand so that she could conduct a pat down for weapons.

31.     During the pat down of his pockets, Plaintiff felt what she recognized as a pipe used for smoking methamphetamines or other controlled substances.

32.     Plaintiff removed the pipe and observed that it contained suspected methamphetamine residue.

33.     Moments later, she located suspected methamphetamines in Dareus's front right pants pocket.

34.     At this point, Dareus was informed that he was under arrest for possession of narcotics and a drug related object.

35.     Upon being informed that he was being arrested, Dareus became even more argumentative.

36.    Plaintiff attempted to move Dareus into the back seat of her patrol vehicle a few feet from away.

37.    Dareus refused to comply.

38.    Plaintiff instructed Dareus multiple times to get into the back seat of her patrol car.

39.    Darius shouted at Plaintiff, actively refused to enter the vehicle, and stepped into Plaintiff, pushing her away from the vehicle with the left side of his body.

40.    The shouting became so loud that officers on the other side of the Texaco were able to hear, causing a Deputy Vives to ask a Deputy Gates to provide assistance as Plaintiff attempted unsuccessfully to turn Dareus and get him into the vehicle as he stiffened against her and turned his body back to face her.

41.    Dareus is six feet and five inches tall and weighs approximately 250 pounds.

42.    Due to his size, aggressive posturing, shouting, and refusal to get into the vehicle as directed, Plaintiff feared that Dareus was about to flee or attempt to knock her to the ground.

43.     Plaintiff was equipped with an asp, oleoresin capsicum (OC) spray, and a firearm.

44.     While Plaintiff was certified to use a taser, the Defendant did not permit her to carry one.

45.     In addition to the asp, OC spray, and firearm, Plaintiff would have been encumbered by extra magazines, a flashlight, tourniquet, two pairs of handcuffs, radio, and her protective vest with armor plates.

46.     Plaintiff feared Dareus would attempt to knock her to the ground or flee across the nearby six lane Tara Boulevard before assistance could arrive.

47.     With her left arm extended to maintain space between herself and Dareus, Plaintiff drew her firearm and raised it to her right shoulder in preparation to defend herself and hoping to deescalate the situation or dissuade Dareus from becoming more violent.

48.     Nearly simultaneous to this action, Deputy Gates arrived on his CCSO motorcycle.

49.     Deputy Gates approached and placed a hand on both Dareus and Plaintiff's firearm, which Plaintiff returned to her holster.

50.     With two officers now present, Dareus became compliant and got into the patrol vehicle.

51.     A short time later, Deputy Vives arrived and assisted Deputy Gates by pulling Dareus towards the passenger side of the vehicle of Plaintiff's patrol vehicle so that he could rest his feet on the left side of the seat due to his great size.

52.     Dareus was booked later that evening and charged with misdemeanor charges of loitering in violation of OCGA § 16-11-36, possession of drug related object, OCGA § 16-13-32.2, and the felony charge of possession of controlled substance in violation of OCGA § 16-13-30(A).

53.     At the time of the arrest, Plaintiff was vastly outweighed by Dareus in addition to being encumbered by the heavy weight of her armor and other equipment.

54.     Therefore, Plaintiff was in justifiable fear of being overpowered, knocked rearward into the concrete tables just behind her, or having to pursue a very large, fleeing felony suspect into traffic only meters away.

55.     Fearing any one of these scenarios, Plaintiff drew her firearm in hopes of preventing these things from occurring.

56.     Plaintiff's other options were to draw her asp or OC spray, both of which are capable of causing death or serious bodily injury.

57.     Plaintiff knew from past experience that the removal of an asp or OC spray from an officer's duty belt has a tendency to further exacerbate an escalating conflict.

58.     In the nine seconds that her pistol was drawn, Plaintiff hoped to prevent a detained felony suspect from attempting to harm her or flee.

59.     Early the following morning, on 7 October 2020 Plaintiff's badge was confiscated, and she was placed on administrative leave.

60.     Later that day, Plaintiff was terminated for allegedly violating the CCSO use of force policy.

61.     By the evening of 7 October 2020 Defendant Victor Hill had already reported to the media and posted on his personal and official social media pages that Plaintiff had been terminated because she "pulled out her issued sidearm and held it to the suspect[']s head under his chin to get him to comply."[2]

62.     Plaintiff's official CCSO photo was published along with the Sheriff's false allegations.

_____

[2] See Sheriff's Nixle post on October 7, 2020.

63.     That evening, Atlanta news media outlets broadcast Plaintiff's official photo on the evening news repeating Defendant Victor Hill's false allegations about the reason for her termination[3].

64.     Less than two weeks later, on 16 October 2020, twenty (20) of the CCSO's Jail Correctional Officers were terminated for falsifying overtime and stealing "nearly a million dollars in a 3-month period of the fiscal year that started in July"[4].

65.     Defendant Victor Hill did not name a single one of the individuals terminated in his 16 October 2020 post and none of the terminated individuals' photos were posted on social media or released to television media outlets.

66.     On 21 or 22 June 2020, just months prior to her termination, another one of the Sheriff's officers was accused of battery against an inmate of the Sheriff's jail, which he consistently refers to as "the Hill-ton".

67.     The accusations against the officer were investigated and video of the incident reviewed.

---

[3] See Fox 5 Atlanta post dated October 7, 2020 ("Deputy Nicole Pitts was terminated late Wednesday afternoon following an overnight investigation, the sheriff's office reported. An Internal Affairs investigation found Pitts had used her sidearm, holding it up to the suspect's head, under the chin".)
[4] See Sheriff's Nixle Report from October 16, 2020.

68.     A hearing was schedule for 26 June 2020 in which the officer would be allowed to defend his actions.

69.     On 26 June 2020, the officer was permitted to resign in lieu of termination (while under investigation).

70.     This officer was black or African American.

71.     A review of Defendant Victor Hill's social media posts on 27 September 2020, 7 October 2020, and 16 October 2020, will reveal that of twenty-two (22) officers terminated from his department during that period, only the white officers' photos were posted and there was no post or other mention of the officer terminated for the 21 June 2020 alleged battery against an inmate.

72.     Not a single African American or black officer who was terminated was specifically named on the Sheriff's social media pages.

73.     There is no record of any other officer terminations by the Sheriff for merely drawing their firearm and there is no CCSO policy which prohibits an officer from drawing their firearm under the circumstances that existed in this case.

## COUNT I - Title VII Claim:  Racial Discrimination

74.    Plaintiff respectfully reincorporates the allegations contained in the above paragraphs as if each were fully set forth herein.

**75.**    At all times relevant hereto, Defendant was and is an "employer" as defined in Title VII.

76.    At all times relevant hereto, Plaintiff was an "employee" as defined in Title VII and engaged as a deputy sheriff working within the course and scope of her employment.

77.    Plaintiff was qualified to serve as a deputy sheriff.

78.    Within weeks of her starting with the CCSO, Plaintiff was assigned to the "Elite Cobra Squad" by Defendant without any additional training, instruction, screening, or other preparation.

79.    Plaintiff was assigned to patrol high crime areas alone, without a partner, or backup.

80.    The mere drawing of a firearm does not constitute a "use of force" and there is nothing in the CCSO policy defining it as such.

81.    Any claim that Plaintiff was terminated for violation of the use of force policy is merely pretextual.

82.     Plaintiff was subjected to disparate treatment, retaliation, and

discrimination based upon her race.

83.     All jurisdictional prerequisites to the institution of a suit under Title

VII have been fulfilled as follows:

      a.     Plaintiff filed a timely written charge of discrimination with the

      United States Equal Employment Opportunity Commission. (See

      EEOC Complaint/Submission of Claim attached hereto as "Exhibit

      A").

      b.     Plaintiff received a "Notice of Right to Sue" less than 90 days

      prior to the filing of this suit. (See EEOC Notice of Right to Sue

      attached hereto as "Exhibit B"); and

84.     Defendant maintained an employment policy, practice, and selection

criteria such that Caucasian/white employees receive disparate and

discriminatory treatment compared to their black or African-American

counterparts.

85.     Plaintiff was subjected to disparate and discriminatory treatment

based upon her race as other deputies, particularly other black or African

American deputies, are regularly required to draw their firearms, especially

when confronting felony suspects, and none have been terminated for this reason.

86.     Plaintiff was subjected to disparate and discriminatory treatment based upon her race when she was terminated within twenty-four (240 hours of the alleged wrongdoing and prior to a thorough investigation, whereas black or African American deputies accused of wrongdoing were not identified on social media by their name or photo and were permitted to resign in lieu of termination after a thorough investigation.

87.     Defendant's actions complained of above evidence a workplace discrimination practice and caused Plaintiff's loss of employment, causing her to incur expenses, costs, and attorneys' fees for which Defendant is liable.

88.     Plaintiff suffered adverse employment actions including termination when she was discharged based on pretextual violation of the "Use of Force" policy.

## COUNT II – Sexual Discrimination

89.     Plaintiff respectfully reincorporates the allegations contained in the above paragraphs as if each were fully set forth herein.

90.    At all times relevant to the allegations, Plaintiff was and is a gay female.

91.    Plaintiff was subjected to disparate and discriminatory treatment based upon her sex and sexual orientation as other deputies, particularly other straight male deputies, are regularly required to draw their firearms, especially when confronting felony suspects, and none have been terminated for this reason.

92.    As with the previous count, all jurisdictional prerequisites to the institution of a suit under Title VII have been fulfilled with regards to her allegation of sexual discrimination. See Exhibits A and B.

93.    Defendant maintained an employment policy, practice, and selection criteria such that gay and female employees received disparate and discriminatory treatment compared to their straight male counterparts by terminating Plaintiff for conduct which non-gay and non-female employees are not terminated.

94.    Defendant's actions complained of above evidence a work discrimination practice and caused Plaintiff's loss of employment, causing her to incur expenses, costs, and attorneys' fees for which Defendant is liable.

95.    Plaintiff suffered adverse employment actions including termination when she was discharged based on a fabricated and pretextual violation of the CCSO's Use of Force policy.

### COUNT III - Wrongful Termination in Violation of Public Policy

96.    Plaintiff respectfully reincorporates the allegations contained in the above paragraphs.

97.    An employee-employer relationship existed between Plaintiff and Defendant.

98.    Plaintiff was terminated from her job with Defendant.

99.    It is the public policy of the State of Georgia that employers shall not discriminate because of race or sex.

100.   Defendant owed a duty to Plaintiff to prevent racial and sexual discrimination from occurring on the job.

101.   Plaintiff's termination violated said policy.

**102.**   Defendant's termination of Plaintiff caused her to suffer injury and damages.

### COUNT IV - Intentional Infliction of Emotional Distress

103.   Plaintiffs respectfully reincorporate the allegations contained in the above paragraphs.

104.    Defendant's conduct in terminating Plaintiff and publishing false accusations against her was intentional or reckless in that he published the false accusations knowing that his statements were contrary to Plaintiff's version of the events.

105.    Further, Defendant's conduct was reckless and intentional in that it was wholly unnecessary and contrary to his prior and subsequent treatment of other employees.

106.    Defendant's conduct was directed at Plaintiff in that he terminated her employment without an opportunity to present evidence at a hearing or resign in lieu of termination as he had done with other officers.

107.    Defendant's conduct was discriminatory and in violation of established and known Federal law.

108.    Defendant's acts and statements were directed at Plaintiff's trade or profession, knowing his actions would cause her emotional distress and pecuniary loss, including her wages, benefits, and ability to obtain subsequent employment.

109.    In publishing her name and photo along with the false accusations, Defendant's actions were extreme and outrageous as they were clearly designed to harm the Plaintiff.

110.   Defendant's conduct caused Plaintiff Nicole Pitts severe emotional distress, including anxiety, humiliation, embarrassment, anger, disappointment, sleeplessness, depression, and pecuniary loss including wages, benefits, and subsequent employment.

111.   Defendant's conduct caused Plaintiff Amanda Pitts' loss of consortium.

## COUNT V - Negligent Infliction of Emotional Distress

112.   Plaintiffs respectfully reincorporate the allegations contained in the above paragraphs.

113.   Defendant terminated Plaintiff and published false statements via social media and various news outlets that Plaintiff "pulled out her issued sidearm and held it to the suspects head under his chin to get him to comply".

114.   Defendant was negligent in failing to review the video of the incident prior to publishing the false statements.

115.   Defendant was negligent in terminating Plaintiff without an opportunity for a hearing or to present exculpatory evidence.

116.   Defendant was negligent in publishing inflammatory and false statements about her without first confirming their veracity.

117.   Defendant's false accusations were made in reference to Plaintiff's trade or profession.

118.   Defendant knew or should have known that Plaintiff's arrest of Mr. Dareus was both lawful, proper, and conducted without any unnecessary use of force.

119.   Defendant was negligent in failing to investigate the matter fully prior to publishing the false and inflammatory statements barely twenty-four (24) hours following the alleged incident.

120.   Defendant breached his duty to Plaintiff by publishing the false statements about her, knowing they would cause her to suffer emotional distress.

121.   Defendant's negligence caused Plaintiff severe emotional distress, including anxiety, humiliation, embarrassment, anger, disappointment, sleeplessness, depression, and pecuniary loss.

122.   Defendant's negligence caused Plaintiff Amanda Pitts' loss of consortium.

## COUNT VI – Loss of Consortium

123.   Plaintiffs respectfully reincorporate the allegations contained in the above paragraphs.

124.   At all relevant times, Amanda Carlene Pitts was and is the spouse of Plaintiff Coleen Nicole Pitts.

125.   As a direct result of Defendant's conduct, Plaintiff Amanda Pitts has suffered from the loss of her spouse's society, companionship, services, and affection.

126.   The Plaintiffs' relationship has suffered due to Plaintiff Nicole Pitts's continuing stress, anxiety, depression, loss of sleep, and loss of income, which has placed substantial strain on their marriage.

## COUNT VII - Punitive Damages

127.   Plaintiff respectfully reincorporates the allegations contained in the above paragraphs.

128.   Defendant's conduct in terminating Plaintiff because of her race and/or sex was done with "malice or with reckless indifference to the federally protected rights" of the Plaintiff in violation of Civil Rights Act of 1991 (Pub.L. 102-166, codified as 42 U.S.C. § 1981a) sufficient to justify an award of punitive damages as contemplated by said statute for claims brought under Title VII and 42 U.S.C. § 1981.

129.   As a direct and proximate cause of Defendant's breach of duty, Plaintiffs were injured and suffered damages.

130.   **WHEREFORE,** Plaintiff respectfully prays for judgment against the

Defendant as follows:

a.   Defendant be permanently enjoined from discriminating against

Plaintiff on any basis forbidden by Title VII;

b.   Defendant be ordered to compensate, reimburse, and make whole the

Plaintiff Nicole Pitts for all the benefits, past and future, she would

have received had it not been for Defendant's illegal actions,

including but not limited to back pay, benefits, bonuses, raises, and

training, including all relief available under 29 U.S.C. § 1001 *et seq.*

Plaintiff should be accorded these benefits which were illegally

withheld from the date of her termination until the date she is tendered

substantially equivalent employment, with interest on the above

withheld amounts to the date of payment;

c.   An award for Plaintiff Amanda Pitts' loss of consortium;

d.   An award of compensatory damages for the Plaintiff's severe

emotional distress, including any associated costs or medical

expenses, in an amount to be determined by the jury;

e.   An award of punitive damages to Plaintiff to deter future wrongdoing

by the Defendant;

f.  That Plaintiff recover her reasonable attorneys' fees including

litigation expenses and costs;

g.  That Plaintiff recover pre-judgment interest; and

h.  Such other relief as the Court deems proper and just.

## **Jury Demand**

Plaintiff demands trial by jury of twelve persons for all issues in this action.

This <u>7th</u> day of <u>December</u> 2021.

Respectfully submitted,

*/s/Jacob A. Weldon*
Jacob A. Weldon
Georgia Bar No.  966930

SEXTON LAW FIRM, LLC
124 Atlanta Street
McDonough GA 30253
(770)-474-9335
jacob@sextonlawfirm.com